**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SATYANARAYAN HEDGE,<br>Plaintiff,<br><br>v.<br><br>RENEE M. TURCHI, M.D., M.P.H., *et al.*,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>: | No. 5:26-cv-3865 |

**<u>O P I N I O N</u>**
**Defendants Turchi, Tower Health, and STC OpCo's Motion to Dismiss, ECF No. 36 – Granted**
**Defendants CHG Healthcare Services and LocumSmart's Motion to Dismiss, ECF No. 37 – Granted**

**Joseph F. Leeson, Jr.**
**United States District Judge**

**September 18, 2026**

## I. INTRODUCTION

Plaintiff Satyanarayan Hegde brought the present action against Dr. Renee M. Turchi, STC OpCo, LLC, d/b/a St. Christopher's Hospital for Children, Tower Health, LocumSmart, LLC, and CHG Healthcare Services. Hegde sought the same employment position with Defendants several times and was rejected each time. He alleges race and ancestry discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"), retaliation in violation of Section 1981, tortious interference with prospective contractual relations in violation of Pennsylvania common law, and civil conspiracy in violation of Pennsylvania common law. Defendants Turchi, Tower Health, and STC OpCo filed a Motion to Dismiss Hegde's Amended Complaint for failure to state a claim. Defendants CHG and LocumSmart have also moved to dismiss the Amended Complaint for failure to state a claim. For the reasons that follow, the Court grants both Motions.

## II. BACKGROUND

### A. Factual Allegations

Hegde would like to work for St. Christopher's Hospital for Children. Hegde "is a board-certified pediatric pulmonologist[,]" who "holds each qualification [the pediatric pulmonology locum tenens[1] assignment] calls for: board certification in Pediatric Pulmonology, an unrestricted Pennsylvania medical license, and current credentials." Am. Compl. ¶¶ 1, 18, ECF No. 34. He is also of "Asian-Indian" and "South Asian" descent. *Id.* ¶ 11.

St. Christopher's Hospital for Children is a subsidiary of Defendant Tower Health. *See id.* ¶ 14. It "has had a continuing need for pediatric pulmonology locum tenens coverage, advertised on a recurring basis." *Id.* ¶ 19. Defendant LocumSmart is the "exclusive vendor-management system for locum tenens staffing[,]" and Tower Health does not take direct applications outside of LocumSmart. *Id.* Defendant CHG owns LocumSmart. *See id.* ¶ 16.

On October 24, 2024, Hegde entered an agreement with a third-party staffing agency called NorTek Medical Staffing, Inc. ("NorTek"). *See id.* ¶ 51. "Under that agreement, NorTek presents [Hegde] to client facilities[, and] uses its best efforts to find and secure assignments." *Id.* NorTek set out "[e]ach confirmed assignment . . . in a Confirmation Letter." *Id.* Pursuant to the agreement, Hegde retained the right to NorTek's "best-efforts" presentation of his candidacy and the right to benefit from each confirmed assignment. *Id.* Hegde's locum tenens "engagements document the pathway from presentation to practice[, and the] pathway completes as a matter of course once the facility's decision-maker accepts the candidate[.]" *Id.* ¶ 52. Hegde

[1] In the health care context, a locum tenens physician is one who is "hired on a temporary basis, to fill in for a regular physician who is absent, or in situations where a medical practice is short-staffed." Turchi Mot. Mem. 2, ECF No. 36-2 (citing *Obi v. Exeter Health Res., Inc.*, No. 18-550, 2019 WL 2142498, at *1 n.1 (D.N.H. May 16, 2019)).

had obtained other positions this way, including at the University of New Mexico (using another CHG subsidiary), Carlsbad Medical Center (using LocumSmart), Merit Health River Region (using LocumSmart), and Providence Queen of the Valley Medical Center (using LocumSmart). *See id.* ¶¶ 29, 52. "[I]n every instance the decision-maker's acceptance was the gate. After [acceptance], credentialing, privileges, payer enrollment, and assignment followed in the ordinary course." *Id.* ¶ 53.

Hegde first sought a locum tenens position at St. Christopher's in July 2020, for which he interviewed with Turchi on September 23, 2020. *See id.* ¶ 88. The interview took place by videoconference, and Turchi allegedly could see his race and ancestry. *See id.* "Tower Health remained in contact with [Hegde] through that autumn, and on October 31, 2020, while the position remained open and Tower Health was still interviewing candidates, [Hegde] withdrew his own application." *Id.* Hegde does not allege injury from his 2020 application. *See id.*

Hegde again sought a pediatric pulmonology locum tenens position on January 10, 2023, after a subsidiary of CHG presented him as a candidate. *See id.* "On February 6, 2023, Marietta Lundberg, writing from a Tower Health [email] address, sent [Hegde] . . . a video[]conference invitation captioned 'Interview Dr. Hedge (Pulmonary),' and attached [Hegde's] then-current curriculum vitae to that invitation." *Id.* The interview (not with Turchi) occurred by videoconference. *See id.* Hegde's curriculum vitae allegedly included his place of birth (India) and his race (Asian Indian). *See id.* St. Christopher's did not hire Hegde and did not provide a reason for his non-selection. *See id.* Hegde also does not allege injury from the 2023 non-selection. *See id.*

On February 20, 2025, Hegde applied for a pediatric pulmonology locum tenens position through a presenting agency, but he "was not selected" and was not "given a reason." *Id.* ¶ 37.

Following his non-selection in February 2025, Hegde filed a compliance complaint to Tower Health's Chief Compliance Officer, alleging discrimination and violations of federal contracting requirements. *See id.* ¶ 34. Hegde also filed "charges of discrimination against Tower Health, St. Christopher's, and LocumSmart before the Pennsylvania Human Relations Commission [("PHRC")] and the Equal Employment Opportunity Commission [("EEOC")]." *Id.* He also filed a separate charge against LocumSmart, CHG, and Leonard Green Partners (a non-party to this case) before the PHRC and EEOC. *See id.*

After separately inquiring about why he was not selected in February 2025, Tower Health's counsel replied on March 19, 2025, stating "that the sole reason for [Hegde's] non-selection was the absence of a Pennsylvania medical license." *Id.* ¶ 37. Undeterred, Hegde "obtained an active, unrestricted Pennsylvania medical license on August 1, 2025." *Id.* ¶ 38. NorTek again presented Hegde for a locum tenens position at St. Christopher's on "at least four documented occasions in 2026: January 14, March 12, April 23, and June 3." *Id.* ¶ 39. "On each occasion he was not selected and received no explanation." *Id.* He requested the basis for his non-selection numerous times, including "seven letters in 2026, dated April 8, April 21, April 23, April 29, May 15, May 19, and May 22, 2026." *Id.* ¶ 40. He alleges that he sent many letters to Defendants and their counsel seeking information or feedback, but only "received automated acknowledgments at most, and no substantive response." *Id.*

On June 1, 2026, a pediatric pulmonology locum tenens position at St. Christopher's "reopened on LocumSmart with the statement that 'the need is immediate.'" *Id.* ¶ 46; *see also* Posting 3, ECF No. 19-4. The reopened posting contained the following instruction: "[p]er the sites request, please do not represent bids that have [] previously been submitted as they were previously passed on by Dr. Turchi." Am. Compl. ¶¶ 3, 47, 50 (hereinafter, "the instruction"); *see*

*also* Anita Mitra Decl. ¶¶ 24, 29–31, ECF No. 19-1 (a declaration from the Senior Director of Operations for St. Christopher's, who conducted the initial review of candidates, that "to avoid the time and resources in reconsidering any candidate who already applied but was not selected, [she] asked Locum[S]mart to only send bids from new candidates"); *see also* Posting 3.

Hegde's "presentation was confirmed on June 3, 2026[.]" Am. Compl. ¶¶ 48, 54. "That bid was live, specific, and confirmed. It identified the candidate, the facility, the coverage window, and the platform's own verification number[ and was] the operative step by which a locum [tenens] engagement is formed." *Id.* ¶ 54. On June 8, 2026, Tower Health rejected Hegde's bid. *See id.* ¶¶ 48, 72. The "Reason for Declining" was "[t]his provider was presented previously[,] and the site is not interested in reviewing this provider going forward." *Id.* ¶¶ 3, 48. It also stated, "[p]lease do not resubmit this bid." *Id.*

Hegde made a written demand on June 2, 2026, to Turchi and to counsel for Tower Health and St Christopher's, which indicated "that the exclusion [from the position] 'reflecte[d] discrimination and retaliation in violation of [Section] 1981 and constitute[d] tortious interference with [Hegde's] prospective contractual relations,' and identified the . . . instruction on the reopened posting as the most recent means of that exclusion." *Id.* ¶ 34. Hegde "demanded that by the close of business on June 3, 2026[,] his candidacy be accepted and selected, through LocumSmart or by direct engagement[, or, alternatively, that a] legitimate, specific reason for non-selection be provided, including for the January and March 2026 presentations." *Id.* Also on June 2, Hegde sent a litigation hold notice to LocumSmart and CHG, "demanding preservation of the platform records." *See id.* ¶¶ 34, 35, 72.

Throughout the sixty-two-page Amended Complaint, Hegde maintains that had the instruction not existed, St. Christopher's would have selected him for the open role because he

met all requisite qualifications. *See id.* ¶¶ 68–71. He also maintains but for his race and ancestry and his filing of complaints with Turchi and Tower Health, as well as Turchi's "discriminatory and retaliatory animus[,]" he "would have been presented and fairly considered on the same terms as candidates outside his protected classes[.]" *Id.* ¶¶ 76–77. Hegde also alleges that "[h]e suffered an adverse action, consisting of two things. First, a standing instruction and an individualized notation that he not be presented at all. Second, his resulting exclusion from the continuing pool of locum [tenens] physicians from which St. Christopher's fills its recurring pediatric pulmonology coverage." *Id.* ¶ 83.

He also alleges that he lost two prospective contractual relationships because of the instruction. *See id.* ¶¶ 99–101. He could not (1) receive a "Confirmation Letter" from NorTek that would carry out the "terms, coverage window, and compensation" for a potential locum tenens pediatric pulmonology assignment, *id.* ¶¶ 51, 82, 100, or (2) obtain "third-party payer enrollments" with "commercial and Medicaid managed-care payers serving St. Christopher's patient population[,]"[2] *id.* ¶¶ 56, 101.

**B. Procedural History**

Hegde filed the original Complaint on June 5, 2026. *See* ECF No. 1. He brought four claims: (1) race and ancestry discrimination under Section 1981 against all Defendants, *see id.* ¶¶ 42–46; (2) retaliation under Section 1981 against all Defendants, *see id.* ¶¶ 47–50; (3) tortious interference with prospective contractual relations under Pennsylvania common law against Turchi, LocumSmart, and CHG, *see id.* ¶¶ 51–58; and (4) declaratory judgment against all Defendants, *see id.* ¶¶ 59–61.

---

[2] Hegde maintains that "[n]o Defendant named in this [tortious interference C]ount is a party to a physician-payer enrollment relation." Am. Compl. ¶ 101.

On June 5, 2026, Hegde filed an emergency motion for a temporary restraining order and preliminary injunction. *See* ECF No. 13. Defendants Turchi, STC OpCo, and Tower Health filed a response in opposition on June 22, 2026. *See* ECF No. 19. The Court denied the motion on June 26, 2026. *See* ECF Nos. 23, 24.

Defendants CHG and LocumSmart filed a motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) on July 6, 2026. *See* ECF No. 26.

Hegde filed an Amended Complaint on July 27, 2026. *See* Am. Compl. He brought four causes of action. First, discrimination based on race and ancestry under Section 1981 against Defendants Turchi, STC OpCo, and Tower Health. *See id.* ¶¶ 80–89. Second, retaliation under Section 1981 against all Defendants. *See id.* ¶¶ 90–97. Third, tortious interference with prospective contractual relations under Pennsylvania common law against Defendants Turchi, LocumSmart, and CHG. *See id.* ¶¶ 98–106. Fourth, civil conspiracy under Pennsylvania common law against Defendants Turchi, LocumSmart, and CHG (in place of the Declaratory Judgment claim). *See id.* ¶¶ 107–110.

On July 28, 2026, the Court dismissed the original motion to dismiss the complaint as moot. *See* ECF No. 35.

Defendants Turchi, STC OpCo, and Tower Health filed a Motion to Dismiss the Amended Complaint on August 10, 2026. *See* Turchi Mot., ECF No. 36; *see also* Turchi Mot. Mem., ECF No. 36-2. Also on August 10, 2026, CHG and LocumSmart filed a Motion to Dismiss the Amended Complaint. *See* CHG Mot., ECF No. 37; *see also* CHG Mot. Mem., ECF No. 37-1. Both sets of Defendants sought to dismiss the Amended Complaint for failure to state a claim on all counts. *See* Turchi Mot.; CHG Mot.

Hegde filed Responses in Opposition to both Motions on August 24, 2026. *See* Resp. to Turchi Mot., ECF No. 38; Resp. to CHG Mot., ECF No. 39. CHG and LocumSmart filed a Reply on August 31, 2026. *See* ECF No. 40.

## III. LEGAL STANDARDS

### A. Motion to Dismiss for Failure to State a Claim – Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Phillips*, 515 F.3d at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (holding that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

complaint by reference, and matters of which a court may take judicial notice"). Also, "a document integral to or explicitly relied upon in the complaint may be considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted). The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B. Discrimination under Section 1981 – Review of Applicable Law**

Section 1981 of the Civil Rights Act of 1866 provides that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "[T]he phrase 'make and enforce contracts' is broadly defined to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" 42 U.S.C. § 1981(b). Generally, claims brought under Section 1981 of the Civil Rights Act of 1866 are also subject to the *McDonnell Douglas* burden-shifting analysis applied to Title VII claims. *See Anh Truong v. Dart Container Corp.*, No. 09-3348, 2010 WL 4237944, at *4 (E.D. Pa. Oct. 26, 2010), *adhered to on reconsideration sub nom. Truong v. Dart Container Corp.*, No. 09-3348, 2010 WL 4611980 (E.D. Pa. Nov. 12, 2010) (explaining that the Third Circuit applies the same Title VII analysis to claims "brought under Section 1981 of the Civil Rights Act of 1866") (citing *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–182 (3d Cir. 2009)).

To establish a *prima facie* case of race discrimination under Section 1981 of the Civil Rights Act of 1866, "a plaintiff must plead (1) that he is a member of a racial minority, (2) intentional discrimination on the basis of race, and (3) discrimination concerning at least one of the activities in the statute, which includes the right to make and enforce contracts." *Tannous v.*

*Cabrini Univ.*, 697 F. Supp. 3d 350, 361 (E.D. Pa. 2023) (citing *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)). A successful Section 1981 claim differs from a Title VII discrimination claim in that, first, a plaintiff setting forth a claim under Section 1981 must allege, *inter alia*, a clear *intent* by the defendant to discriminate on the basis of race, *see Anh Truong*, 2010 WL 4237944, at *4 (citing *Carpenter v. Ashby*, 351 F. App'x 684, 687 n.6 (3d Cir. 2009)), and second, a Section 1981 plaintiff bears the burden of pleading at the start, and proving at the summary judgment stage, that *but-for* his race, he would not have suffered the loss of a legally protected right.[3] *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). For Section 1981 claims, "it is no longer sufficient, even at the pleading stage, to argue that race was a 'motivating factor' in the loss of a legally protected right." *Tannous*, 697 F. Supp. 3d at 362 (citing *Comcast Corp.*, 589 U.S. at 336–341).

**C. Retaliation – Review of Applicable Law**

The Supreme Court has held that Section 1981 also encompasses "the claim of an individual (black or white) who suffers retaliation because he has tried to help a different

---

[3] Much like how the Supreme Court clarified the causation standard for Title VII claims in *Bostock v. Clayton Cnty., GA*, 590 U.S. 644 (2020), the Supreme Court clarified the causation standard for claims brought under Section 1981 in *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media* that same year. *See* 589 U.S. 327 (2020). Unlike the history of Title VII practice, which long advocated for use of a "motivating factor" test at the pleadings stage (if not at all stages of litigation), Section 1981 has always "follow[ed] the usual rules" for causation, *see Comcast Corp.*, 589 U.S. at 341. "To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Id.* Unlike Title VII claims, Section 1981 claims require the plaintiff to plead but-for causation in his *prima facie* case. *See id.* Similar to Title VII claims, the burden of persuasion always remains with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citing Fed. R. Evid. 301) (other citations omitted); *see also Nahas v. Shore Med. Ctr.*, 473 F. Supp. 3d 383, 405–406 (D.N.J. 2019), *aff'd*, 828 F. App'x 89 (3d Cir. 2020) ("Although 'the burden of production may shift [for Section 1981 claims], the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'") (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)).

individual, suffering direct racial discrimination, secure his [Section] 1981 rights." *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 451–452 (2008). In a retaliation case, a plaintiff must demonstrate that there had been an underlying Section 1981 violation. *See id.*; *see also Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010).

To establish a *prima facie* case of retaliation under Section 1981, "a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

Pursuant to the first element, a report to a superior may constitute protected activity where discrimination is specifically alleged in the verbal or written report*.* *See LeBlanc v. Hill Sch.*, No. 14-1675, 2015 WL 144135, at *14 (E.D. Pa. Jan. 12, 2015) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)); *see also Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006) (stating that the employee must have a good faith, reasonable belief that the activity complained of is unlawful (citing *Clark Cnty v. Breeden*, 532 U.S. 268, 271 (2001))).

As to the second element, a plaintiff must show that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 341 (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Under the third element, a plaintiff must show a causal connection between the protected activity and the retaliatory act. *See Moore,* 461 F.3d at 341–342. In determining causation, courts often look to the "temporal proximity between the protected activity and the alleged discrimination" and "the existence of a pattern of antagonism in the intervening period." *Jensen*

*v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)) (internal quotation marks omitted), *overruled on other grounds by Burlington Northern*, 548 U.S. 53. Since there is no single, definite way of showing causation, the court must look at the evidence "as a whole" to determine if retaliation has been sufficiently pleaded. *See Jensen*, 435 F3d at 450 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–281 (3d Cir. 2000)).

However, "for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016) (explaining that "a *prima facie* case is an evidentiary standard, not a pleading requirement, and hence is not a proper measure of whether a complaint fails to state a claim" (internal quotations and citations omitted)). "Instead of requiring a *prima facie* case, the post-*Twombly* pleading standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]." *Id.* at 789 (internal quotations and citations omitted).

**D. Tortious Interference with Prospective Contractual Relations – Review of Applicable Law**

To establish a claim of intentional, or tortious, interference with prospective contractual relations under Pennsylvania law, a plaintiff must demonstrate (1) "a prospective contractual relation"; (2) the "purpose or intent," on the part of the defendant, "to harm the plaintiff by preventing the relation from occurring"; (3) "the absence of privilege or justification on the part of the defendant"; and (4) "the occasioning of actual damage resulting from the defendant's conduct." *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 184 (3d Cir. 1997).

"A prospective contractual relation 'is something less than a contractual right, something more than a mere hope.'" *Santana Prods. Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123,

140 (3d Cir. 2005) (quoting *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979)). "In determining whether there is a prospective contractual relationship in a tortious interference case, Pennsylvania courts have considered whether the evidence supports a finding that there was an objectively 'reasonable likelihood or probability' that the contemplated contract would have materialized absent the defendant's interference." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 213 (3d Cir. 2009) (citations omitted).

**E. Civil Conspiracy – Review of Applicable Law**

"In Pennsylvania, 'to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'" *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987–988 (Pa. Super. Ct. 1997)). Additionally, proof of malice is an essential part of a conspiracy claim. *See Lackner v. Glosser*, 892 A.2d 21, 35 (Pa. Super. Ct. 2006) (citation omitted).

The first element "may be proved by acts and circumstances sufficient to warrant an inference that the unlawful combination had been in point of fact formed for the purpose charged. While conspiracy may be proved by circumstantial evidence, the evidence must be full, clear[,] and satisfactory. Mere suspicion or the possibility of guilty connection is not sufficient, nor proof of acts which are equally consistent with innocence." *Scully v. US WATS, Inc.*, 238 F.3d 497, 516 (3d Cir. 2001) (internal marks omitted) (citing *Fife v. Great Atl. & Pac. Tea Co.*, 52 A.2d 24, 27 (Pa. 1947)). "'[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act.'" *NSI Nursing Sols., Inc. v. Volume*

*Recruitment Servs., LLC*, No. 17-1613, 2019 WL 426732 at *8 (E.D. Pa. Feb. 4, 2019) (internal quotation and citation omitted).

## IV. ANALYSIS

Although the Court acknowledged deficiencies in Hegde's original complaint in its Opinion denying the motion for a temporary restraining order and preliminary injunction, Hegde's claims in his Amended Complaint still fail. Initially, the Court notes that Hegde fails to plausibly plead race and ancestry discrimination under Section 1981 because he fails to allege facts that would raise an inference of intent to discriminate. Next, since Hegde did not plausibly plead discrimination (a Section 1981 violation), his retaliation claim under Section 1981 also fails. In addition, Hegde fails to plausibly plead a prospective contractual relationship, or that LocumSmart or CHG intentionally interfered in such a relationship. Finally, in the absence of a viable tortious interference claim, Hegde cannot state a civil conspiracy claim based upon the tortious interference with prospective contractual relations claim.

### A. Discrimination Under Section 1981

Hegde fails to plausibly plead race discrimination under Section 1981. Hegde alleges that Turchi, STC OpCo, and Tower Health knew his race and ancestry, which is "Asian-Indian" and "South Asian," from his curriculum vitae and prior interviews. Am. Compl. ¶¶ 11, 88. Yet, the fact that the aforementioned Defendants knew of Hegde's race does not mean that they intentionally discriminated against him. *See Holmes v. Fed Ex*, 556 F. App'x 150, 151 (3d Cir. 2014) ("[M]ere awareness, particularly in light of the conclusory nature of [the plaintiff's] other allegations, is patently insufficient to raise an inference of discrimination under [Section] 1981.").

Moreover, Hegde does not present any allegations that Turchi, STC OpCo, or Tower Health intentionally discriminated against him *because* he was South Asian and Indian. Hegde appears to believe that he could not submit a new bid for a locum tenens position (and therefore could not be considered for the position) because of his race and ancestry. *See* Am. Compl. ¶ 83. He does not plead facts in support of these conclusory allegations. Hegde simply believes that his non-selection was discriminatory, which is insufficient to state a discrimination claim. *See Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 702 (W.D. Pa. 2010) ("An inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action."). To the contrary, Hegde refers to the Anita Mitra Declaration, wherein Mitra stated that she asked LocumSmart to send bids from new candidates, *not* previous candidates, which includes, but does not refer to, Hegde. *See* Mitra Decl. ¶ 30; *see also* Am. Compl. ¶ 50. The Declaration does not support Hegde's discrimination claim because the reason for the instruction was to avoid spending extra time and resources in re-reviewing applications from previous candidates. *See id.* Thus, Hegde fails to plausibly plead intentional race discrimination under Section 1981. *See Davis v. Samuels*, 962 F.3d 105, 115–116 (3d Cir. 2020) (affirming dismissal of a plaintiff's Section 1981 claim against the defendants for failing to state a plausible race discrimination claim); *see also Patel v. Crist*, No. 19-9232, 2020 WL 64618, at *4 (D.N.J. Jan. 7, 2020) ("Plaintiffs allege that, in part, because of their Indian ethnicity, Plaintiffs became a target of Allstate's racial profiling policy. . . . But Plaintiffs' Complaint is devoid of facts to substantiate the conclusory allegations.").

The Court dismisses Count I.

**B. Retaliation Under Section 1981**

Since Hegde's discrimination claim fails, his Section 1981 retaliation claim also fails. Hegde has not plausibly alleged race discrimination under Section 1981. "In a retaliation case a plaintiff must demonstrate that there had been an underlying [S]ection 1981 violation." *Estate of Oliva*, 604 F.3d at 798. Earlier, the Court found that Hegde failed to plausibly plead race discrimination under Section 1981. Hegde thus fails to plead a Section 1981 violation and likewise cannot state a retaliation claim. *See Argentina v. Gillette*, No. 17-2908, 2018 WL 623680, at *3 (E.D. Pa. Jan. 30, 2018) (finding no viable Section 1981 retaliation claim where the plaintiff failed to plausibly plead a race discrimination claim in violation of Section 1981); *see also Morris v. SugarHouse HSP Gaming, L.P.*, No. 24-1916, 2025 WL 1435631, at *7 (E.D. Pa. May 19, 2025) ("[The plaintiff] has failed to establish any predicate Section 1981 violation about which she complained. . . . Therefore, because no underlying Section 1981 violation has occurred, she has failed to establish a Section 1981 retaliation claim.").

The Court dismisses Count II.

**C. Tortious Interference with Prospective Contractual Relations**

Hegde fails to state a claim for tortious interference with prospective contractual relations. He fails to allege a prospective contractual relationship with St. Christopher's (and, ostensibly, with Defendants Turchi, Tower Health and STC OpCo) *or* any intentional interference in such a relationship by CHG or LocumSmart.

Initially, Hegde alleges no more than a mere hope of obtaining the locum tenens position at St. Christopher's. Hegde's allegations speak to his discontent that Turchi failed to hire him, although he was qualified for the position. Hidden in plain sight in the Amended Complaint is the allegation that a decisionmaker must accept the applicant. *See* Am. Compl. ¶¶ 52–53. St.

Christopher's (through Turchi) must accept Hegde before forming a contractual employment relationship. It did not. Rather, Hegde unsuccessfully sought the same position numerous times. *See id.* ¶¶ 37, 39, 48, 54, 88. There was no reasonable probability that he would be accepted. Quite the opposite, as he has been repeatedly rejected. Hegde thus cannot allege any prospective contractual relationship because he has no more than a mere hope of employment with St. Christopher's. *See Dover v. Marine Transp. Lines*, No. 89-5600, 1991 WL 204032, at *3 (E.D. Pa. Oct. 2, 1991) ("Mere unilateral refusal to enter into an employment or other contractual relationship with another does not state a claim for tortious interference with prospective contract relations.") (citing *A-1 Credit & Assur. Co. v. Trans Union Credit Info. Co.*, 678 F. Supp. 1147, 1150 (E.D. Pa. 1988)); *see also McLaughlin v. Int'l Bhd. of Teamsters, Loc. 249*, 641 F. Supp. 3d 177, 222–223 (W.D. Pa. 2022), *aff'd sub nom. McLaughlin v. Int'l Bhd. of Teamsters Loc. 249*, No. 25-1613, 2026 WL 2295776 (3d Cir. Aug. 10, 2026) ("By pointing to his qualifications and asserting, without any factual support, that he 'should have been hired,' [the plaintiff] is alleging nothing more than a mere hope of future employment[. . . Q]ualifications alone do not establish a reasonable probability that he would have been hired absent the alleged blacklisting because there may have been many qualified applicants. Instead, [the plaintiff] must show 'something more' that elevates his hope of employment to a reasonable probability of employment."); *see also Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1392 (3d Cir. 1991) (noting that the plaintiff could not show more than a "mere hope" of being accepted to medical school).

To the extent that Hegde alleges that CHG and LocumSmart tortiously interfered in his prospective contractual relationship with St. Christopher's, he fails to allege that they engaged in any intentional conduct to preclude *him* from the position. Hegde alleges that LocumSmart entered and maintained the instruction, which thus barred his consideration as a candidate for

employment, and CHG "authored and administer[ed] the conventions that made a single platform notation a channel-wide exclusion." Am. Compl. ¶ 104(b)-(c). Hegde does not allege anything about their individual intents to keep *Hegde* from consideration for employment. Rather, the instruction only precludes consideration of candidates who previously applied for the position but were not selected. *See id.* ¶ 47. The instruction says absolutely nothing about Hegde: he himself alleges that the instruction applies to him based upon his individual non-selection. *See id.* ¶¶ 3, 48. Beyond the fact that the instruction does not address Hegde, since Hegde does not plead facts alleging the existence of a prospective contractual relationship with any of the three Defendants, it follows that LocumSmart and CHG could not have intentionally interfered in such a relationship. *See The Bancorp Bank. v. Isaacs*, No. 07-1907, 2010 WL 1141336, at *11 (E.D. Pa. Mar. 25, 2010) (dismissing a tortious interference with prospective contractual relations claim because the allegations "failed to identify . . . prospective contracts which were interfered with by those entities, and [] fail[ed] to establish that it was harmed by any alleged actions"); *see also Knierim v. Siemens Corp.*, No. 06-4935, 2008 WL 906244, at *18 (D.N.J. Mar. 31, 2008) (dismissing a tortious interference with prospective contractual relations claim because the plaintiff failed to allege how one defendant intentionally interfered with the plaintiff's prospective employment).

The Court dismisses Count III.

**D. Civil Conspiracy**

Since the Court dismissed Hegde's tortious interference with prospective contractual relations claim, he cannot bring an accompanying civil conspiracy claim against Turchi, CHG, and LocumSmart based upon the aforementioned tort. "Where a plaintiff has not alleged a viable underlying tort claim, any claim for civil conspiracy must be dismissed." *Feingold v. Unitrin*

*Direct*, No. 12-1250, 2012 WL 3866945, at *7 (E.D. Pa. Sept. 6, 2012); *see, e.g., Floyd v. Brown & Williamson Tobacco Corp.,* 159 F. Supp. 2d 823, 834 (E.D. Pa. 2001) (noting that a plaintiff failed to plausibly plead civil conspiracy because his underlying tort claims were either barred by the statute of limitations or failed to state a claim); *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 418 (E.D. Pa. 2014), *aff'd,* 625 F. App'x 594 (3d Cir. 2016) ("Plaintiff's civil conspiracy claim must be dismissed . . . because the underlying torts Plaintiff *does* allege are all legally deficient."); *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. Ct. 2004) (citation omitted) ("[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." ).

Here, the Court previously dismissed Hegde's tortious interference with prospective contractual relations claim, which was his only basis to allege a conspiracy. Therefore, Hegde also fails to state a claim for civil conspiracy.

The Court dismisses Count IV.

**E. Amendment**

Hegde already amended his complaint after receipt of CHG's and LocumSmart's original motion to dismiss, which raised similar arguments to the instant Motions to Dismiss. At the time Hegde amended his complaint, he also had notice of the deficiencies identified by this Court in its Opinion denying his motion for a temporary restraining order and preliminary injunction. *See* ECF No. 23 (finding that Hegde failed to show that his claims were likely to succeed on the merits). The Amended Complaint purports to add facts but does not rectify the issues presented in the original complaint. A district court may deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2*) amendment would be futile*, or (3) the amendment would prejudice the other party. *See,*

*e.g., Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir. 2002) (emphasis added). Here, Hegde's claims still fail, even after amendment. It would be futile to permit Hegde to file a second amended complaint when his claims still do not present sufficient factual matter to satisfy the federal pleading standard. The Court will not grant further leave to amend. *See Carpenter v. Ashby*, No. 06-1451, 2007 WL 2670294, at *4 (E.D. Pa. Sept. 7, 2007), *aff'd*, 351 F. App'x 684 (3d Cir. 2009) ("In determining that it would be futile for plaintiff to again amend the complaints, the Court has considered plaintiff's 'repeated failure to cure deficiencies' in the [c]omplaint in this action, and his repeated failure to state a claim for discrimination in the related cases[.]").

## V. CONCLUSION

For the foregoing reasons, the Court grants both Motions to Dismiss. The Court dismisses Hegde's Amended Complaint with prejudice.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*_______
JOSEPH F. LEESON, JR.
United States District Judge